IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 4, 2019

**STATE OF TENNESSEE v. ROY BRANDON**

**Appeal from the Criminal Court for Shelby County**
No. 15-02733      Chris Craft, Judge

_____

**No. W2018-01608-CCA-R3-CD**
_____

The Defendant, Roy Brandon, was convicted by a Shelby County Criminal Court jury of possession with intent to sell heroin, a Class B felony; possession with intent to deliver heroin, a Class B felony; two counts of simple possession of Alprazolam, Class A misdemeanors; and two counts of possession of a firearm during the commission of a dangerous felony, Class D felonies, and was sentenced to an effective term of twenty-two years in the Department of Correction. On appeal, the Defendant argues that the trial court erred in denying his motion to suppress evidence and that the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jessica L. Gillentine (on appeal), Bartlett, Tennessee, and Latonya Burrow (at trial), Memphis, Tennessee, for the appellant, Roy Brandon.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Defendant and a co-defendant were indicted for possession with intent to sell heroin; possession with intent to deliver heroin; possession with intent to sell Alprazolam; possession with intent to deliver Alprazolam; and four counts of possession of a firearm during the commission of a dangerous felony. Following an unsuccessful motion to suppress, the case proceeded to trial, but after the jury was selected, the trial court granted a motion for mistrial by the Defendant and co-defendant. Several weeks later, the case went to trial before a new jury, and the Defendant was convicted as charged of possession of heroin with intent to sell and deliver in Counts One and Two, the lesser-included offenses of simple possession of Alprazolam in Counts Three and Four, and possession of a firearm during the commission of a dangerous felony as charged in Counts Five and Six. He was acquitted in Counts Seven and Eight.

**Motion to Suppress**

Before trial, the Defendant filed a motion to suppress evidence, alleging that officers illegally seized the motel room and its occupants, the officers' assertions about items in "plain view" were "dubious at best," and there were conflicting dates regarding the search warrant.

At the suppression hearing, the Defendant testified to establish his standing to seek suppression of evidence found in Room 210 at America's Best Value Inn on Springbrook Avenue in Memphis. He said that on January 23, 2015, he was at the location and had a key to and lawful permission to be in that room. He had clothing in the room and had been there for "[a]bout a week, seven days at the most." A lady named Renita Scott had rented the room and given him a key.

The co-defendant, Nicholas Jones, testified that he was also in Room 210 at America's Best Value Inn on that date. He said that the police knocked on the door around 8:00 or 9:00 that morning. They knocked for two or three minutes, and then the Defendant opened the door. Mr. Jones recalled that he had spent one night in the room, did not have a key to the room, and did not have any "stuff" there.

On the issue of standing, the trial court found that the Defendant and Mr. Jones each had an expectation of privacy in the motel room and "allow[ed the case] to go forward as to each defendant."

Officer Hardy Savage of the Memphis Police Department ("MPD") testified that on January 23, 2015, he received a warrant tip that the Defendant was in a room at America's Best Value Inn on Springbrook Avenue. Based on that tip, Officer Savage went to the motel to "conduct what we call a knock and talk." When he arrived at the motel, he saw "a red Monte Carlo, that was known to belong to [the Defendant.]" He

then went to the room to conduct the "knock and talk, they basically knock on the door and see who comes to the door."

Officer Savage explained that America's Best Value Inn is a two-story motel with approximately sixty rooms on each floor. To get to the Defendant's room, "[y]ou just walk up to the door, there's no entry to a foyer, or anything." Officer Savage said that the Defendant answered the door after he knocked on it, and then he explained:

> Well, immediately I take him into custody, or detain him, because when I see his face I recognize him as being the one that we're looking for. . . . Officer Burk was standing next to me as we were detaining him[.] [O]ut of the corner of my eye I see somebody in the far back of the room, stick their head around the corner. Not knowing who he is, we detain that individual, as well.

Officer Savage stated that as he was detaining the Defendant, Officer Burk went into the room to detain the other individual and saw a table with a plate and a razor blade with a white powdery substance. The officers took the two men to their patrol car, verified the warrant for the Defendant and tried to identify the other man. They called their lieutenant and told him what they observed in the motel room. The lieutenant came to the scene and asked if the men would consent to a search of the room, but they refused. The lieutenant called the Organized Crime Unit ("OCU") to the scene, and then officers from OCU and Officer Burk went to obtain a search warrant. Once the warrant was obtained, officers searched the motel room.

Officer Savage recalled that they had first received a tip a few days earlier that the Defendant was staying at the motel but did not have a room number. They learned from a front desk employee that a room was not registered in the Defendant's name. Thereafter, they received another tip that included the room number. Outside the motel, they saw a red Monte Carlo, which was registered to the Defendant, and proceeded to the room number from the tip. Officer Savage relayed:

> Officer Burk initially knocked several times, no answer. I am standing, for security purposes, over to the right, he's standing to the left of the door frame. There's a window on the right, so I am standing off to the window, knocks, no answer, knocks again, no answer, but then the blinds move. So the air-conditioner is at the bottom and the air-conditioner isn't on, but I see the blind moving.
>
> So I tell Burk, I say, look I'm fixing to go. And as I'm starting to leave, he says, "Savage" and I turn around and that's when the [D]efendant was standing in the door.

Officer Savage said that they announced, "Memphis Police Department, open the door," when they knocked on the door.

On cross-examination, Officer Savage recalled that the door opened into the motel room, and the hinges were on the left-hand side of the door. Officer Savage acknowledged that Officer Burk went into the room to get the other individual before a warrant was obtained. He also acknowledged that he patted down the Defendant for officer safety. He found no drugs or guns on the Defendant but did find $409 cash, made up of three $100 bills, four $20 bills, two $10 bills, and nine $1 bills.

Officer Savage testified that there was only one door into and out of the room. He recalled that when Officer Burk called him back to the doorway, the door was open and the Defendant was standing in the doorway. The door was "open [wide] enough for an individual to stand in the doorway." Asked why he "went further" after detaining the Defendant as a known subject of an outstanding warrant, Officer Savage explained that they did not know who the other subject was in the room and "for officer's safety purposes, when we are in a room we are going to detain all individuals in that room." He recalled that he was still at the door with the Defendant while Officer Burk was detaining the other individual, and he "look[ed] over and s[aw] a plate with something that appear[ed] to be contraband." He described the contraband as "the plate with the razor blade on it and the white powdery residue on it." He recalled that the contraband was on a dresser or TV stand on the left-hand side of the room. He noted that when Officer Burk entered the room to detain the other man, the door into the room opened wide. He said that the dresser with the contraband was not behind the door but instead in the space next to the wide-open door.

Officer Steven Burk with the MPD went to the America's Best Value Inn on January 23, 2015, because he had learned that the Defendant, "a wanted party," was possibly staying there. The tip also mentioned that the Defendant "would be operating a red Chevrolet Monte Carlo and that he would be, possibly, selling drugs out of the [m]otel." Officer Burk and Officer Savage approached the motel staff to see if the Defendant was staying there and were directed to Room 210. Officer Burk knocked on the door for "three to four minutes" and then the Defendant opened the door. At that point, the Defendant and Mr. Jones, were detained. The detainees were placed in the officers' squad cars, and Officer Burk notified his lieutenant, who called OCU to the scene.

Officer Burk said that when he and Officer Savage took the two men into custody, they "saw, in plain view, a razor blade with some white powdery substance in its vicinity." He affirmed that they were able to see the razor blade and white substance

from the doorway. He informed the OCU officers of what he and Officer Savage had seen, and they obtained a search warrant.

Officer Burk was referred to his affidavit in support of the search warrant, from which he read: "While taking them into custody your affiant noticed in plain view on the table an open safe that contained a bag of a white powdery substance consistent with powder cocaine, or a cocaine cutting agent and razor blades that had a white residue on it." He said that he did not go into the motel room to detain the two individuals; they both came to the door and were detained at that point.

Detective Brandon Evans with the OCU of the MPD responded to the America's Best Value Inn to assist uniform patrol. He prepared a search warrant application based on information provided by Officers Savage and Burk, as well as his personal experience as a narcotics detective. Detective Evans participated in the execution of the warrant after it was issued.

Sergeant Darryl Dotson with the OCU of the MPD also responded to the scene. Sergeant Dotson recalled that during the search of the room, he collected a nine-millimeter handgun with approximately eight live rounds, two clear plastic bags with Alprazolam pills, and thirty-nine bags of heroin. Counsel for the Defendant asked Sergeant Dotson about the layout of the room:

Q:    If you open the door –

A:    If you open the door you still can see the dresser and the table.

Q:    Okay. If you open it about a foot, what would you see?

A:    You wouldn't even have to open a foot, even if you cracked the door you can see the dresser on your left.

Q:    On your left, behind the door?

A:    It wasn't behind the door, ma'am. It was – when the door opened you still could see, so the dresser was long enough to where it wasn't completely behind the door. It wasn't hidden behind the door.

Officer William Vrooman with the MPD also responded to the scene. He verified that the pills recovered in the motel room were Alprazolam.

Evan Clower, an investigator with Inquisitor, Incorporated, was hired by the Defendant to conduct an investigation in his case. As part of her investigation, Ms. Clower took photographs of Room 210 at America's Best Value Inn on October 17, 2016, which she identified and were admitted into evidence. Ms. Clower said that if a person was standing outside the door to Room 210, the door hinge "would be on the left[-]hand side." She said that if the door to the room was slightly opened, a person standing at the door would not be able to see the dresser and table on the left side of the room or the sink and mirror that were straight across from the door.

On cross-examination, Ms. Clower conceded that she took the photographs of Room 210 more than a year and a half after the police detained the men and searched the room in January 2015. She could not say that her photographs correctly depicted what the room looked like the day the Defendant was apprehended.

The Defendant presented proof that the affidavit for the search warrant showed that the warrant was issued on the wrong date, January 23, 2014, not 2015.

Following the conclusion of the hearing, the trial court denied the motion to suppress.

**Trial**

Officer Savage testified at trial consistently to his testimony at the suppression hearing. Officer Savage said that he and Officer Burk knocked on the motel room door for approximately five to seven minutes when he saw the blinds move. He announced that he was "going to get the key" loud enough for whoever was inside the room to hear him. The individual opened the door, at which point Officer Savage could see into the room past the individual. Officer Savage recalled that "behind him on a table or a dresser . . . was a . . . white powdery substance, and then further on in the back of the room was the individual sitting over to the right." He elaborated that as he was placing handcuffs on the Defendant, a "second individual kind of peeked around the corner [and] Officer Burk immediately saw him and detained him as well." Officer Savage noted that Officer Burk went into the room to detain the second individual. Officer Savage said that they detained the individuals "[t]o preserve the evidence and for further investigation" because the evidence appeared to be cocaine. After detaining the two men, the officers called their lieutenant, who came to the scene and then called OCU. When Officer Savage patted down the Defendant, he found $409 on his person.

Officer Burk also testified at trial consistently to his testimony at the suppression hearing. He said that they waited at the door to the motel room for "a few minutes at least" before the Defendant opened the door. Officer Savage detained the Defendant,

while Officer Burk detained the other individual in the room—the co-defendant. In the room, Officer Burk saw "a plate with a razor blade on it with a white powdery residue, and also in the vicinity of that plate, there was a clear plastic bag with some sort of white powder[,]" which gave him "reasonable suspicion to believe that there was illegal activity going on in that area." The officers removed the two men from the room and called their lieutenant, who came to the scene and then called OCU. Officer Burk went with an officer from the OCU "to type up a warrant." They obtained a search warrant and returned to the motel. When Officer Burk conducted a pat-down of the co-defendant, he found just over $100 on his person in various smaller denominations. The co-defendant gave Officer Burk "an incorrect identity."

Detective Evans testified that he responded to the scene as a member of the OCU. They obtained a search warrant for the motel room based on information relayed to them by uniform patrol and returned to the motel to execute it. Detective Evans recalled that coming into the room, there was a television and dresser on the left, and there was an open, small black safe on the dresser. He remembered:

> There was a large clear bag tied in a knot with a white substance, powdery substance consistent with cocaine. There was also a plate next to that with a razor blade on it. Other things that we found [we]re a silver compressor, which is used to compress either cocaine or heroin. We found a marijuana grinder, heroin, a weapon, a handgun, individual scale as well.

Detective Evans looked at photographs taken inside the motel room and pointed out packages of marijuana, Alprazolam pills, and individual packages of heroin. He said that they did not find any syringes, rubber bands, or belts to indicate that the occupants were using the heroin. Instead, what he found was "consistent with the distribution and selling of narcotics." He elaborated:

> It's individually packaged. The small white wrappers of heroin would go for $20, which is a tenth of a gram of heroin. It's not consistent with somebody who . . . uses heroin. Somebody who uses heroin usually has a very small minute amount. They have a syringe, most of the time it's already been injected into them.

Sergeant Dotson also responded to the scene as a member of the OCU. He recalled that once a warrant was obtained, they performed a systematic search of the motel room. They found a digital scale, a grinder, a compressor, cutting agent, a nine-millimeter handgun, 10 Alprazolam pills, and 39 packs of heroin. The gun was found inside a brown bag under the sink. The Alprazolam and heroin were found in a black suitcase under a clothes rack. The total weight of the heroin was 9.3 grams; a typical user

amount is 0.1-0.2 grams.  The evidence was taken to police headquarters and logged into the property and evidence room.

Detective Donna Boykin with the MPD's OCU picked up the recovered drugs from the property and evidence room and delivered them to the Tennessee Bureau of Investigation ("TBI") for analysis.

Special Agent Rachel Strandquist, a forensic scientist with the TBI, performed chemical analysis on the materials submitted in this case.  She concluded that the 10 pills were Alprazolam, and a tan powder and a "rock-like substance" were heroin.  A white powder was not identified as a controlled substance, although testing indicated that it had come in contact with a controlled substance at some point.

## ANALYSIS

### I. Suppression

The Defendant argues that "[t]he trial court erred when it did not suppress the evidence found as a result of an unreasonable search and seizure."

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998).  The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings.  See id.  However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo.  State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures.  See U.S. Const. Amend. IV; Tenn. Const. art. I, § 7.  "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)).  "[T]he general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012).  Under the "fruit of the poisonous tree" doctrine, evidence obtained by exploitation of an unconstitutional

search and seizure may also be suppressed.  See State v. Ingram, 331 S.W.3d 746,760 (Tenn. 2011) (citing Wong Sun v. United States, 372 U.S. 471, 488 (1963)).

The Defendant asserts that the officers' actions exceeded the scope of a consensual "knock and talk."

Courts have generally recognized the right of police officers to enter portions of a person's property that are implicitly open to the public for purposes of seeking consent to perform a search.  State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003).  The "knock and talk" procedure is considered to be a consensual encounter with the police. Id.  In explaining the procedure and reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. at 521 (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

However, as opposed to a typical "knock and talk" situation, in this case, the police officers approached the motel room where they believed the Defendant to be with a warrant for the Defendant's arrest.  At the hearing on the motion to suppress, Officer Savage testified that he received a warrant tip that the Defendant was in a room at America's Best Value Inn on Springbrook Avenue and that he was driving a red Monte Carlo.  When officers arrived at the motel, there was a red Monte Carlo in the parking lot. Officer Savage noted that they had received a warrant tip a few days earlier that the Defendant was staying at the motel but did not have a room number.  Thereafter, they received another tip that included the room number.  When the police knocked on the door, they had a warrant for the Defendant's arrest and reason to believe that he was inside.  The United States Supreme Court has held that police in possession of a valid arrest warrant can properly enter a defendant's residence where they reasonably believe the defendant to be:

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.  Thus, for Fourth Amendment purposes, an arrest warrant founded on probable

cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

Payton v. New York, 445 U.S. 573, 602-03 (1980).

The officers' authority in this case to approach the motel room exceeded that associated with an ordinary "knock and talk." Based on the arrest warrant, the presence of a red Monte Carlo the Defendant was known to drive, and the warrant tip indicating the specific room in which the Defendant was staying, the officers had "limited authority to enter [the] dwelling in which the suspect" was staying. Once the Defendant opened the door and Officer Savage recognized him to be the subject of the arrest warrant, the police were justified in entering the room to apprehend him.

We note that the officers' recollections vary from three to seven minutes with regard to how long they knocked on the motel room door before the Defendant answered it. Thus, the Defendant asserts that "[t]he officers did not 'knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave[,]" as would be appropriate in a consensual "knock and talk." Relying on the United States Supreme Court's decision in Florida v. Jardines, 569 U.S. 1 (2013), and this court's decision in State v. Holly N. Hilliard, No. E2015-00967-CCA-R3-CD, 2017 WL 3738470 (Tenn. Crim. App. Aug. 29, 2017), the Defendant claims that the officers' actions "served to convey a feeling in the listener that he had no choice but to open the door." However, the police in the present case had a warrant for the Defendant's arrest and reason to believe he was in the motel room, which distinguishes this case from Jardines and Holly N. Hilliard. The officers were not limited to the scope of a consensual "knock and talk."

The Defendant also claims that the officers did not have a legal right to be in the motel room when they viewed the evidence that was the basis for the search warrant and that the contraband could not have been observed from any spot the officers were legally entitled to be. As explained above, the officers had a legal right to enter the room based on the warrant for the Defendant's arrest and reason to believe he was in the room. When the Defendant opened the door and officers identified him as the subject of the arrest warrant and detained him, "the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990). The officers acted within the scope of permissible action in detaining the co-defendant inside the room as a matter of officer safety. As Officer Savage provided the rationale: "We didn't know who that other individual was and for officer's safety purposes, when we are in a room we are going to detain all individuals in that room." The officers were then legally in the room when they

- 10 -

observed, in plain view, a plate and a razor blade with a white powdery substance. The Defendant contests whether the officers could have seen the razor blade and white powdery substance without entering the room, however, there was testimony indicating that the items could have been viewed without entering the room. Moreover, in any event, there is no dispute that the items were in plain view within the room, and the officers' entry into the room was legal as a matter of officer safety.

## II. Sufficiency

The Defendant argues that the evidence is insufficient to support his convictions, asserting that "no evidence exists to support a finding that [he] 'knowingly' possessed the controlled substances nor the handgun."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).

Tennessee Code Annotated section 39-17-417(a)(4) provides, in pertinent, that it is an offense for a defendant to knowingly possess a controlled substance with intent to sell or deliver it. In addition, it is an offense to possess a firearm during the commission of or attempt to commit a dangerous felony, which includes during a felony involving the possession with intent to sell or distribute a controlled substance. Id. § 39-17-1324(a), (i)(1)(L). Possession may be constructive as well as actual. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001); State v. Transou, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996); State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). "Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984) (citation omitted). An individual's mere presence in an area in which drugs are found, or association with another individual in possession of drugs, is not, alone, sufficient to establish constructive possession. Shaw, 37 S.W.3d at 903 (citing State v. Patterson, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997); Cooper, 736 S.W.2d at 129).

The Defendant asserts that there was no evidence of possession in this case. He points out that nothing was found on his person, and the room was not registered to him or the co-defendant. He notes that the contraband was found under the sink in a paper bag, in a black suitcase, and in a small safe, and that the "record is void of any evidence establishing his possession or interest in the heroin, [A]lprazolam and the gun seized."

However, in the light most favorable to the State, there is sufficient evidence to establish that the Defendant constructively possessed the drugs and gun. The officers that

- 12 -

responded to the scene testified that there was men's clothing and men's shoes laying around the room. The beds were disheveled and there was a lot of baggage in the room. There was no evidence of items belonging to a woman in the room. A defendant's "possession of and residence in the motel room is strong evidence of his 'ability to reduce [the drugs] to actual possession[.]'" State v. Ross, 49 S.W.3d 833, 846 (Tenn. 2001) (quoting Transou, 928 S.W.2d at 956). The evidence is sufficient to establish that the Defendant constructively possessed the drugs and gun.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE